## HARP v. CHOCTAW, O. & G. RY. CO.

(Circuit Court, W. D. Arkansas, Ft. Smith Division. August 1, 1902.)

1. CARRIERS—RIGHT TO LIMIT AND REGULATE BUSINESS.

In the absence of charter or statutory provisions affecting its right, it is competent for a railroad company to determine for itself within what limits it will act as a common carrier, what business it will engage in, what means and methods of transportation it will employ, what goods it will carry, and between what points and under what circumstances and conditions it will receive the same, subject always to the limitation that it must act in good faith, reasonably, and not arbitrarily or capriciously, and without discrimination; doing for all under like circumstances what it does for any one.

2. SAME—DISCRIMINATION IN FURNISHING CARS—DIFFERENT MODES OF LOADING.

The refusal of a railroad company to furnish cars to the owner of a coal mine, to be loaded by wagons on its commercial tracks in its yards at a station at a time when the business of the road was unusually heavy, necessitating the constant use of such tracks, and its supply of cars was insufficient to handle its traffic, while at the same time it furnished cars to other mine owners on their own private tracks, to be loaded by tipple, was not unreasonable; nor did it constitute an unlawful preference or discrimination, either under the common law, or the statutes of Arkansas, which prohibit any preference or discrimination in the furnishing of cars.

3. SAME.

The action of a railroad company in furnishing cars to be loaded by wagon on its tracks at a station with coal for shipment in one direction to points within the state, while it refused to furnish cars to be so loaded for interstate shipments in the opposite direction, was not an unlawful discrimination against a shipper, where the order applied to all persons alike.

4. SAME—RAILROADS—OBLIGATION TO BUILD PRIVATE SPUR TRACKS.

A railroad company is under no legal obligation to construct a spur track from its line to a coal mine for the private benefit of the owner in

¶ 4. See Carriers, vol. 9, Cent. Dig. §§ 22, 30.

shipping his product; nor can it be held liable in damages for unlawful discrimination because of its refusal to build such track, although it had permitted to be built, and assisted in building, similar tracks to other mines.

On Directing Verdict for Defendant.

Hill & Brizzolara, for plaintiff.

E. B. Peirce, for defendant.

ROGERS, District Judge. Gentlemen of the Jury: I am constrained by my view of the law of this case to instruct you to return a verdict for the defendant. The far-reaching importance of the case, as well as its somewhat novel features, have induced me to consume more time than is usual in its consideration. Every shipper and every railroad company in the state is interested in the questions of law involved, and the decision, of course, affects immense interests. It is therefore due counsel, the jury, and the court that I state my reasons for the course to be pursued. There is fortunately very little conflict in the evidence, and it is gratifying that in such conflict the witnesses on both sides have deported themselves with unusual candor and fairness. Any differences may be fairly attributed to the infirmities of memory, inaccuracies of speech, and misunderstandings at the time as to what was said, rather than to any disposition to pervert facts.

It was urged that the Conatser Case, 61 Ark. 562, 33 S. W. 1057, governed this case. A very careful review of that case leads me to doubt its application to the facts at bar. At all events, I am not willing to base my action on that case. Conatser held cotton at Ozark, Ark. He wanted to sell for cash to buyers on the ground. He could not sell unless cars could be had upon which to ship it. He applied to the railroad company for cars. They were not furnished. Hence the cotton could not be sold. Cotton declined, and he sued the railroad company for the difference between the price he could have sold for, had the cars been furnished, and the price he did sell for after it declined. The court held, on his own evidence, that he was not a shipper, but a seller, of cotton, and that he had no cause of action against the railroad company, and dismissed his suit. In the case at bar, plaintiff had a coal mine. He could not sell his coal or ship it without cars. He applied for cars. They were not furnished. He had orders for all the coal he could mine, for $1.25 per ton, free on board the cars at Hartford, where his mine was located. It cost him 96 cents per ton to mine and load it on the cars. He sued for the difference between the cost and selling price. What was his legal status? The plaintiff was to load the coal and bill it out to the purchasers, who purchased free on board cars after billed out. It did not appear that Conatser was to load cotton or bill it out, or that he intended to do either. And this is the distinction between the two cases. I do not think, on more mature reflection, that the Conatser Case is applicable to the facts in the case at bar.

The material facts of the case are these: When the defendant railroad company was extending its line from Howe, Ind. T., east through the state of Arkansas, it intersected the Arkansas state line about a

mile from the old town of Hartford, in Sebastian county, Ark., where it owned a large body of coal land, and there laid out a new town. The old town of Hartford was a mere village, of no commercial importance, and only a few persons resided there. Shortly after the road was put in operation at that place the railroad company permitted some one to work a strip pit on its land near the station, and load coal by wagons on cars standing on its switches at the station. Very soon thereafter the plaintiff began working an old mine in the vicinity, which had been opened and worked for local supply before the railroad was constructed, and he, too, loaded by wagon on the same switches. One of his witnesses, Rogers, who was working a small mine near by, did the same thing. This arrangement as to plaintiff and Rogers continued until August·14, 1901. In the meantime the defendant railroad had sold its coal land, including the strip pit above referred to, and two large coal companies had been organized and had opened mines at Hartford, and another was at the time in full operation a mile or two off, equipped with private switches and tipples for quick loading. These switches were built in this way: The coal operators and the railroad authorities agreed where the switches should be put in. The operator furnished the right of way, the ties, and did the grading. The railroad company furnished the iron and laid the rails, and, after it was constructed, controlled the switches. In the fall and winter of 1900–01, the business of the road had increased abnormally by reason of large crops and the immense development of coal and other products along the line, and also because it was constructing large eastern and western extensions of its line. Hartford, which for business amounted practically to nothing in the beginning, had become a large shipping point for coal, and its commerce had increased in proportion; indeed, it had increased all along the line. Some time in the spring or early summer of 1901 (the plaintiff's evidence tends to show, about the 14th of August, 1901) the defendant company notified the plaintiff that the loading of coal on its commercial tracks at Hartford could not be continued, and that the company would not receive or ship coal except by car loads, and the cars to be loaded on the private switches of the coal operators and by tipple. The undisputed evidence is that the demand for cars at that time was much greater than the supply, and the company then had given orders for nearly one-third as many new coal cars as it then had in use, and they could not be had; that to continue the loading of coal cars by wagon on its commercial switches at Hartford was necessarily slow, and thereby had a tendency to reduce the maximum shipping facilities of the road, and, moreover, delayed and interfered with its commercial traffic, and rendered dangerous the operation of the road to defendant's employés, the persons employed in loading the cars from the wagons, and the traveling public; that these were the reasons that the practice of loading cars on the commercial tracks in defendant's yards at Hartford was discontinued. The undisputed evidence shows that, at the time the notice was given, no other persons on its entire line, except plaintiff and the witness Rogers were loading cars on the commercial tracks at its stations. True, both at Hartford and at Red Oak some cars were loaded from strip pits by wagon, but always on the private

tracks of the operators; and this was not allowed, except temporarily, to enable the operator to open his mine, and for the reason that a tipple could not be used until the stripping was stopped, and what is called the "slope" was begun. Soon after the defendant railroad company gave the notice referred to, plaintiff, Harp, began negotiations with various officers of the company to secure some method of loading his coal. These negotiations resulted in nothing. The testimony in relation to these negotiations is very confusing as to dates, and quite conflicting in detail. It is not perceived that it is very material to the questions involved; but the plaintiff, Harp, insisted that a switch should be put in running from his mine, and intersecting the ground set apart for the company's station track yard. This the defendant company refused to do. Suffice it to say they failed to agree upon any point at which the company should put in a spur track to plaintiff's mine. Meantime plaintiff, Harp, and his witness, Rogers, who was similarly situated with reference to his coal operations, brought the matter to the attention of the state railroad commission, and the state railroad commission brought about a conference with the defendant railroad authorities. It was ascertained by the defendant company that the state railroad commission held the view that it was compelled to furnish Harp and Rogers equal facilities with other shippers of coal, notwithstanding the method in which they were conducting their business. Accordingly, in October, 1901, for prudential reasons, the defendant company offered cars to plaintiff and all other persons at Hartford, destined for eastern points in Arkansas, on the theory that the state railroad commission had no jurisdiction as to cars going west, and engaged in interstate commerce. Later, in January, 1902, the commission having decided the defendant must furnish cars destined west, it for the same prudential reasons complied with that order. At this time plaintiff had no coal orders for western points, the season for coal shipping being about closed. The plaintiff brought suit in this court for the difference between the cost of putting the coal free on board the cars at Hartford, which was 96 cents, and the value of the coal free on board cars at Hartford, which was $1.25, for the full capacity of his mine from August 1, 1901, to February 15, 1902.

On this state of facts, two questions arise: First. Was the refusal of the railroad to furnish cars to plaintiff on its commercial tracks in its yards at Hartford, to be loaded by wagons, while at the same time it furnished cars to other mine owners on their private tracks, to be loaded by tipple, such a discrimination against plaintiff as the law condemns? Second. If not, was the railroad company, under the facts stated, compelled by law to put in a switch for plaintiff's convenience at such place as he required, or at any other place?

It was conceded and there seems to be no diversity of authority on the subject—both the decisions of the courts and the text-writers concurring—that the rule is that a common carrier, so far as concerns the receipt and transportation of goods, however it may be as to freight rates, must, where the conditions and circumstances are identical or substantially similar, treat all shippers alike. It cannot furnish facilities to some shippers, and deny them to others, unless

there is a difference in the conditions and circumstances, such as makes the discrimination a just one. Public policy forbids that carriers shall be permitted to favor one shipper, or one class of shippers, in discharging the general duty to accept and carry goods, to the prejudice of others. 4 Elliott, R. R. § 1468. The same author says:

"The general rule that a railroad company is under a duty to carry goods properly offered for transportation is, as we have indicated, subject, among other limitations and qualifications, to the limitation that its obligation extends only to the kind of goods the company undertakes to carry. In other words, railroad companies are common carriers only as to those goods which are of the kind usually or professedly carried. * * * A further qualification of the general rule is that railroad companies are common carriers to the extent only of those means and methods of transportation which they own, use, or hold out to the public." 4 Elliott, R. R. § 1466.

In Railroad Co. v. McDonough, 21 Mich. 195, 4 Am. Rep. 466, Judge Christiancy, in delivering the unanimous opinion of the courts, stated the doctrine as follows:

"It has been frequently held, and seems to be well settled, that companies incorporated under charters which simply permit, but do not require, them to undertake the business of common carriers, become such, as to any particular kind of property (though such as comes within all the reasons of the law of carriers), or as to any particular portion of their route, only so far as they hold themselves out as such to the public, and are under no obligations to carry otherwise or other kinds of property than they publicly profess to carry. Oxlade v. Railway Co., 15 C. B. (N. S.) 680; Johnson v. Railway Co., 4 Exch. 367; Farmers' & Mechanics' Bank v. Champlain Transp. Co., 23 Vt. 186, 206, 56 Am. Dec. 68; 2 Redf. Railways, 116."

The authorities cited furnish apt illustrations of the principles announced.

In Oxlade v. Railway Co., supra, the case was decided under an act of parliament known as the "Cardwel Act," which provided:

"That every railway company," etc., "shall afford all reasonable facilities for the receiving and forwarding and delivering of traffic," etc.; "and no such company shall make or give any undue or unreasonable preference or advantage to or in favor of any particular person or company, or any particular description of traffic, in any respect whatsoever; nor shall any such company subject any particular person or company, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

But the court in that case held:

"There is no obligation on any railway company, whether at common law or under the railway traffic act of 1854, to carry goods otherwise than according to their profession. Therefore it is competent to them to restrict their coal traffic to the carriage of coal for colliery owners from the pit's mouth to stations where such colliery owners have sales or depots appropriated to them for the reception and sale of their coals, and to decline to carry coals from station to station, or for coal merchants; such an arrangement being essential to the regulation of the large traffic in that article, and the company not being common carriers of coal."

This decision was afterwards confirmed in 1 C. B. (N. S.) 454.

The act of congress constituting the charter of the defendant company imposes no duties whatever upon the defendant company in reference to receiving or transporting freight or passengers, or as to the furnishing of facilities therefor. Such matters were left to be

governed by the law of common carriers. Under the principles announced, and under the common law, and even under the Cardwel act in England, which, as will appear, is much broader and goes much further than the statute law of this state, it is clear that it was within the power of the defendant company to determine for itself the means and methods of transportation which it would employ or hold out to the public, as well as the character and kind of goods it would carry, or profess or hold itself out to carry, and under what conditions it would accept and receive the same for transportation, and from and to what points it would transport articles received for transportation. To illustrate: Suppose some one had driven up to the station at Hartford and shoveled out on defendant's platform a wagon load of mine-run coal or slack, and offered it for transportation, and demanded that it be transported to Booneville, Ark., and delivered to John Smith, accompanying his offer by the freight charges. Was the company bound to accept it and transport it? Suppose a dozen different mine operators at Hartford, operating 100 wagons for loading coal on cars, should demand of defendant that 50 cars a day be set out on its switches and side tracks in its yards at Hartford, to be loaded with coal from wagons. Is the company, under the law, compelled to grant the request? If so, the same thing may be done at every station for every person demanding it, and for every purpose, for coal has no imperial rights over lumber, cotton, stone, or merchandise; nor has the coal operator any rights superior to the lumber dealer, the cotton speculator, the operator of the marble quarry, the agriculturalist. The common law made none. The statutes make none. All are to be treated alike. The answer to these questions, therefore, is that if the defendant company is engaged in carrying coal, or permitting it to be loaded in its yards, in the manner stated, for one person, it cannot lawfully deny it to another; but if it does not hold itself out as doing that kind of transportation, and is not in the habit of doing it for anybody, then no one has any right to complain. The questions put, therefore, resolve themselves into this: Who shall have control of the operating of the road,—the company or its customers? Who shall determine what the railroad will transport, —the company or the shippers? Who shall say to what points the company will transport goods,—the company or its customers? Who shall say what the means and methods of transportation shall be,— the company or its customers? In short, who shall determine what the business of the company shall be and how it shall be carried on? Solved by the principles of the common law and common sense, it must be the company, as all will agree that no railroad could be operated at all by those who patronize it.

It is not intended to be said that duties and obligations cannot be imposed by statutes on corporations. They owe their existence to the state, and the state may impose, by their charters, such terms as it sees fit, or deny charters altogether. It is only meant to say that where, by the charter, no such duties or obligations are imposed, railroads may determine for themselves what business they will engage in, what means and methods of transportation they will employ, what goods they will carry, and between what points and under what

circumstances they will receive them, subject always to the principles of the common law already announced, so far as applicable to the point in hand, and also, within proper limits, to the police power of the state, from which power the state cannot part, and may exercise at its will, within constitutional limitations. Of course, the general rules stated are rules to be kept within the bounds of good faith and fair and reasonable conduct on the part of common carriers. They may not arbitrarily, whimsically, or capriciously, and without reasonable grounds, deny transportation simply because they have it in their power to do so; neither could they, under like circumstances, make changes not in good faith as to what they will carry, where they will carry it to, or the means and methods to be employed; but to hold that, within the principles stated, they cannot enlarge or curtail the class or kinds of articles they would carry, or determine the means and methods to be employed or to be held out to the public, would be, in the absence of statutory regulation, to take from the carrier the conduct of its own business, and subject it to its customers. It must not be forgotten that the principles just stated are subject, always, to this principle: That what it does for one it must do for all under like circumstances. Naturally all its interests will induce it to do all the business it can safely do, of all kinds, which afford it a just remuneration, so that its selfishness is at last the greatest security the customer has for getting his business done.

The question recurs whether the company discriminated against plaintiff and in favor of other persons in refusing to furnish plaintiff cars on its commercial tracks in its yards at Hartford, to be loaded by wagons, while at the same time it furnished cars to others at Hartford on their own tracks, to be loaded by tipples. I do not think this an open question. If the cars furnished other coal operators to be loaded on their own tracks had been permitted to have remained there unloaded for a month, they would not have interfered in the slightest degree with the general business of the road, except to withdraw from active use the cars then so much in demand; nor would such cars on the private tracks of the operators have involved any danger either to the employés of the mine, the servants of the railroad, or the traveling public. But every car standing on the commercial tracks of the company in its yards, to be loaded by wagons, is, in the very nature of things, an impediment to the rapid dispatch of business, involving switching, wear and tear of the rolling stock, and danger to the road's servants, the employés of the coal operators, and to the traveling public, to all of whom the road is responsible for delays, and injuries resulting from carelessness and the improper conduct of its business. Moreover, in the very nature of things, cars could not be loaded as rapidly by wagons as by the tipple; and therefore the former involved, to some extent, delays in loading cars, which, in view of the then inadequate supply, the road could ill afford. The conditions under which plaintiff was operating his mine were not, therefore, the same, or substantially the same, as those of other mine operators. They were radically and essentially different. I do not think it reasonable to say the

road was without authority to regulate its affairs in matters of that kind. To say that it has not is to affirm that its whole commercial traffic is to be impeded, and its traveling public, and its own employés and those of the coal companies loading cars in its yards by wagons, shall be subjected to increased dangers from accidents, in order to allow one man the privilege of doing what, manifestly, competent railroad management would condemn. I cannot conclude otherwise than that the action of the defendant company in thus denying the loading of cars on its tracks in its yards was not only legal and reasonable, but manifestly in the interest of the safe, expeditious, and proper conduct of its business, and that in so doing there was no unjust discrimination against plaintiff.

But it is urged that by our statute it is made the duty of the defendant company to provide some place at which a mine owner, under the conditions and circumstances occupied by the plaintiff, could load his coal, either by wagons or by a spur track. This statute says that it shall be unlawful for any person or corporation "to make any preference in furnishing cars or motive power," and it requires that all persons and corporations "shall furnish, without discrimination or delay, equal and sufficient facilities for the transportation of passengers, the receiving, loading and unloading, storing, carriage and delivery of all property, of a like character carried by him, them, or it." But is it a preference to furnish cars to a coal company which has provided a track of its own upon which the cars shall be loaded, and refuse cars to a person to be loaded by wagon on its commercial tracks at its depot? The word "preference," as used in this statute, necessarily implies that one has been preferred over another similarly situated. If this were not so, then it would follow that to refuse to give one man cars under any condition, and give them to another under any other condition, would constitute a preference; and the result would be that every man, without reference to his facilities for doing business, or the amount of business he expected to do, should have cars given to him, and then the right of the railroad company to manage and control its own methods and means of transportation, and to hold out to the public under what conditions and circumstances it would do business, would be wholly withdrawn. It cannot be fairly said that the statute in this regard, as applied to this case, has made any change whatever in the law; nor was the plaintiff in this case discriminated against at all when the railroad refused to furnish him cars under the circumstances stated, and granted cars to others who had conformed to the conditions which were imposed for the shipment of coal.

But it is said that in October the railroad company receded from this order refusing plaintiff cars to be loaded by wagons on its commercial tracks at Hartford, to this extent: that it offered to furnish cars to be loaded by wagons on its commercial tracks at Hartford, destined to points of shipment east of Hartford, in Arkansas, and that in so doing it held itself out as transporting coal of persons to be loaded from wagons into cars standing on its commercial tracks at Hartford, and that therefore there was a discrimination, because defendant refused to furnish cars for the transportation of such coal

to points west of Hartford. Waiving the circumstances under which this was done, the answer to this proposition is this: That whatever change was made in the order applied to all persons alike, and therefore there was no discrimination against the plaintiff.

It is said that later, in January, 1902, the order referred to was rescinded in toto, and that cars were then offered for points destined both east and west. It is not contended, however, that plaintiff may recover by reason of that revoking order, because it was of the order revoked that he complained beforehand, and, moreover, after that time he does not claim any damages because of the failure to furnish cars. It may be said, also, that when, in January, 1902, the order was finally revoked, it applied to the plaintiff as well as to all other persons, and therefore there was no discrimination as against him.

I am of the opinion that there is no reasonable and fair view which can be taken of this case upon which any discrimination or preference, whether undue or unreasonable or not, can be predicated.

But it is insisted that, when the old method of loading cars was discontinued, some other facilities should have been provided by which plaintiff could have loaded his coal; that is to say, the defendant company should have put in a spur track for his benefit on the same conditions it put in tracks for others. If this were true, the question would arise where, and under what conditions and circumstances, this spur track should be constructed. The very nature and character of the railroad business necessarily implies that the power could only be lodged in the railroad company itself, or in some tribunal created by law. Manifestly the coal operator could not be allowed to determine that question. If it belonged to one coal operator to compel the company to furnish a track to his mine, it belongs to every other operator to do the same thing; and the result would be that in a coal region there would be as many spur tracks along the company's road as there would be coal mines, and these compelled to be put in by the railroad company without reference to its convenience or the safety of its operation. That this is not the law is, in the opinion of the court, conclusively established, by reason of the fact that, in a country where these operations have been going on for half a century, no case has been cited or can be found which holds that doctrine. In this respect the laudable industry and research of eminent counsel has not been rewarded by the discovery of a single case or text-writer supporting that doctrine. But there is the very best authority to the contrary, and it underlies this whole case, and uproots it, from any standpoint from which it may be viewed.

The constitution of Nebraska provides that:

"Railways heretofore constructed or that may hereafter he constructed in this state are hereby declared public highways, and shall be free to all persons for the transportation of their persons and property thereon, under such regulations as may be prescribed by law. And the legislature may from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on the different railroads in this state." Article 10, § 4.

And by section 7:

"The legislature shall pass laws to correct abuses and prevent unjust discrimination and extortion in all charges of express, telegraph, and rail-

road companies in this state, and enforce such laws by adequate penalties, to the extent, if necessary for that purpose, of forfeiture of their property and franchises."

In pursuance of this constitutional provision the legislature of Nebraska passed an act which will be found set out in a note on pages 404, 405, 164 U. S., 17 Sup. Ct. 130, 41 L. Ed. 489.

The statute of Nebraska of 1887 (chapter 60, §§ 1-3)—

"Prohibits and declares to be unlawful all unjust and unreasonable charges made by a railroad company for any services rendered in the transportation (which includes all instrumentalities of shipment or carriage) of passengers or property, or in connection therewith, or for the receiving, delivering, storage, or handling of such property. The demanding or collecting, directly or indirectly, by a railroad company, from any person, of a greater compensation for such service than it demands or collects from any other person for a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, is declared to be unjust discrimination. It is also made unlawful to give any preference or advantage to, or to subject to any prejudice or disadvantage, any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever; and railroad companies are required, according to their respective powers, to afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and not to discriminate in their rates and charges between such contracting lines. By paragraph 17, upon complaint in writing concerning any lack of facilities or accommodations furnished by a railroad company for the comfort, convenience, and accommodation of individuals and the public, or concerning any unjust discrimination against any person, firm, corporation, or locality, either in rates, facilities furnished, or otherwise, the board of transportation, whenever, in its judgment, any repairs of, or additions to or changes in, any portion of the road, rolling stock, stations, depots, station houses, or warehouses of a railroad company, are necessary in order to secure the safety, comfort, accommodation, and convenience of the public and individuals, or any change in the mode of conducting its business is reasonable and expedient in order to promote the security and accommodation of the public, or to prevent unjust discrimination against persons or places, is directed to order the railroad company to make such repairs, additions, or changes." 164 U. S. 413, 414, 17 Sup. Ct. 134, 41 L. Ed. 489.

Under the constitution and statutes of Nebraska, one Hollenbeck and others appealed to the state board of transportation of that state to compel the Missouri Pacific Railroad to permit them, for their own private use, to erect an elevator on its right of way for the storage and shipment of grain, on the ground that others were granted a like privilege, and their elevators were insufficient to accommodate shippers, and that the refusal to grant them the same privileges and facilities was a violation of the statute and an unjust discrimination, etc. A hearing was had before the state board of transportation, and the relief sought was granted. The railroad company refused to comply with its order. Thereupon the state of Nebraska, under the act, filed its suit to compel the railroad company to conform to the order of the state board of transportation. The railroad resisted, and the supreme court of Nebraska construed its constitution and the statutes, and sustained the state board of transportation. The case was carried by writ of error to the supreme court of the United States, where the supreme court of Nebraska was reversed. In doing so, that court said:

"To require the railroad company to grant to the petitioners a location on its right of way for the erection of an elevator for the specified purpose of storing from time to time the grain of the petitioners and of neighboring farmers is to compel the railroad company, against its will, to transfer an estate in part of the land which it owns and holds, under its charter, as its private property and for a public use, to an association of private individuals for the purpose of erecting and maintaining a building thereon for storing grain for their own benefit, without reserving any control of the use of such land, or of the building to be erected thereon, to the railroad company, for the accommodation of its own business, or for the convenience of the public. This court, confining itself to what is necessary for the decision of the case before it, is unanimously of opinion that the order in question, so far as it required the railroad corporation to surrender a part of its land to the petitioners for the purpose of building and maintaining their elevator upon it, was, in essence and effect, a taking of private property of the railroad corporation for the private use of the petitioners. The taking by a state of the private property of one person or corporation, without the owner's consent, for the private use of another, is not due process of law, and is a violation of the fourteenth article of amendment of the constitution of the United States."

A similar, but more analogous, case, in its details, came before the interstate commerce commission in Mt. Vernon Milling Co. v. Chicago, M. & St. P. Ry. Co., 7 Interst. Com. R. 194. There the complaint was for an alleged unjust discrimination, in not permitting a location on its side tracks for a grain elevator, while it granted the same privilege to others under the same circumstances; and, secondly, in not constructing a switch for plaintiff, as it had done for others engaged in precisely the same business and under the same circumstances. This case arose under the laws of South Dakota. By the statutes of that state it is provided that:

"Every railroad company shall permit connections to be made and maintained in a reasonable manner, with its side track, to and from any warehouse, elevator or mill, and adjacent to any station on its line, without reference to its size or capacity, where grain or flour is or may be stored: provided, however, that such railroad company shall not be required to pay the cost of making and maintaining such connection, or of the siding or switch track necessary to make the same: and provided, further, that a majority of the commissioners appointed under this act shall direct such railroad to make such connection and siding." Comp. Laws 1887, § 146.

But the commission dismissed the suit on the authority of Missouri Pac. R. Co. v. Nebraska, 164 U. S. 403, 17 Sup. Ct. 130, 41 L. Ed. 489.

Both of these cases afford much light on the case at bar, and erect a barrier against the relief sought. It will be observed, too, that, in both the cases cited, action was had under state statutes authorizing the things done which were done, while in this state no legislation exists which authorizes the state board of railroad commissioners, or any board, to compel the defendant to permit plaintiff to load cars in its yards, or to furnish plaintiff a private switch on which to load. All that is said upon the subject will be found in article 17 of the constitution of Arkansas of 1874, and sections 10, 11, and 22 of the act of March 11, 1899 (Sess. Acts 1899, p. 82 et seq.), and they fall far short of the legislation referred to in the states of Nebraska and South Dakota. These decisions apply to both aspects of this case. The constant loading of cars by wagons in defendant's

yards, all day and every day, by plaintiff, against the defendant's will, to the detriment, delay, danger, and denial of its own business, when no one else along its entire line was allowed to do so, and when it was not a common carrier of coal by such methods as plaintiff desired to employ, and was not furnishing cars or carrying coal for others in that way, nor holding itself out to do so, was, pro tanto, as much an appropriation of private property to private use, and therefore a taking of private property without due process of law, as it would have been, in the above-cited cases, to have compelled the defendants to allow plaintiffs to construct elevators on the rights of way of said defendants, to be used by said plaintiffs for private, and not for public, purposes; for it must be remembered that the plaintiff in this case was not engaged in any public business, but was simply a private citizen, operating a coal mine on his own account.