HARP v. CHOCTAW, O. & G. R. CO.

(Circuit Court of Appeals, Eighth Circuit. October 16, 1903.)

No. 1,847.

1. CARRIERS—REGULATIONS GOVERNING MANNER OF RECEIVING GOODS—RIGHT TO CHANGE.

At common law a common carrier has power to make reasonable regulations governing the manner and form in which it will receive such articles or commodities as it professes to carry, and also to change or modify such regulations from time to time upon reasonable notice to the public.

**2. SAME—MANNER OF LOADING COAL.**

A railroad company having a newly constructed line through a locality underlaid with coal, by permitting owners of mines to load cars with coal from wagons on its side track at two small stations for a number of months, did not give them a vested right to continue such manner of loading, nor lose its common-law right to change its regulations, and refuse longer to receive coal for shipment in such manner when the volume of its business became such that to permit the use of its station tracks for loading cars in that manner would not only interfere with the operation of its trains, and cause it loss and inconvenience, but would also, by reason of the slowness of the method, result in serious loss and inconvenience to other shippers and the public by greatly reducing the quantity of coal which the road could handle and transport below what it might if loaded by the use of modern appliances, as was the case at all other shipping points on its line.

**3. SAME—PREFERENCE IN FURNISHING CARS.**

A carrier which transports large quantities of coal is entitled to make regulations with respect to the manner of receiving and transporting it, so that it may be handled expeditiously, safely, and economically, without unnecessary interference with the carrier's other business; and regulations which are well designed to promote such object cannot be complained of on the ground that they operate to give a preference to one who complies with them, or as a discrimination against one who does not.

**4. SAME—ARKANSAS STATUTE.**

Defendant railroad company, which had previously permitted the loading of cars with coal on its side track at a station, made a regulation by which it withdrew such permission, and it thereafter refused to furnish cars to be so loaded to plaintiff or to any other shipper. During such time, however, certain mine owners, who through agreements with the company had constructed private spur tracks to their mines, were furnished cars, some of which they loaded from wagons while standing on such spur tracks before the development of the mines and the construction of tipples for loading. *Held*, that the furnishing of cars for such purpose, while refusing to furnish cars for loading on the station track to plaintiff, who had constructed no spur track, did not constitute the giving of an undue preference, either under the common law or the statute of Arkansas (Laws 1899, p. 89), prohibiting the giving of any preference in the furnishing of cars.

In Error to the Circuit Court of the United States for the Western District of Arkansas.

For opinion below, see 118 Fed. 169.

Joseph M. Hill (James Brizzolara, on the brief), for plaintiff in error.

Edward B. Pierce (John W. McLoud, on the brief), for defendant in error.

Before SANBORN, THAYER, and VAN DEVANTER, Circuit Judges.

THAYER, Circuit Judge. This case was tried to a jury in the Circuit Court of the United States for the Western District of Arkansas, and at the conclusion of all the testimony the trial court directed a verdict in favor of the defendant, which action on its part is said to have been erroneous, and is assigned for error. The complaint on which the case was tried contained two counts. In the first of these counts Jesse A. Harp, the plaintiff in error, alleged, in sub-

¶ 4. See Carriers, vol. 9, Cent. Dig. § 22.

stance, the following facts: That he was the lessee of a coal mine situated very near Hartford, Ark., a station on a railroad belonging to and operated by the Choctaw, Oklahoma & Gulf Railroad Company, the defendant in error; that from September, 1900, until about February 1, 1901, he operated this mine by taking out the coal and hauling it in wagons to the Hartford station, where it was loaded from the wagons into coal cars that had been set out for that purpose on a side track by the defendant company; that during all of the period last aforesaid the defendant company held itself out to the public as a common carrier of freight, being especially engaged in the carriage of coal, and that there were four other shippers of coal at Hartford besides the plaintiff from whom it received coal for transportation in the manner last described—that is to say, by setting out cars as they were called for on a side track to be loaded from wagons; that all the coal so placed on board cars by the plaintiff at Hartford during the period aforesaid was shipped by him westward to points outside of the state of Arkansas, in Oklahoma and Texas; that he succeeded, during said period, in building up a good demand for his coal in those localities, and that in expectation of a larger demand for his product during the coal season beginning August 1, 1901, he bought 40 acres of coal land near the station at Hartford. He further averred that from and after August 1, 1901, and from that time forward, until about February 15, 1902, the defendant company refused to set out coal cars on the side track at Hartford to be loaded from wagons, as it had previously done, save that on or about October 7, 1901, it did offer to furnish cars at that station to be loaded from wagons for the shipment of coal to points in Arkansas, and that, by reason of such conduct on the part of the defendant, his trade in coal was practically destroyed during the fall of the year 1901, and that he had sustained damages in a sum exceeding . $6,000, for which he demanded judgment. The second count of the complaint was substantially like the first in all of its material allegations, except that in one paragraph thereof it was charged that other parties, who were engaged in mining and shipping coal, to wit, the Kansas & Texas Coal Company, the Prairie Creek Coal Company, and the Arkansas & McAlester Coal Company, shipped coal from the station at Hartford, and that during the period when the defendant company had refused to set out cars at Hartford for the use of the plaintiff it had supplied cars at said station for the use of such other parties, thereby giving them an unreasonable preference and advantage, to the plaintiff's damage in a sum exceeding $6,000.

The facts developed at the trial below, concerning which there was practically no controversy, are these: From September, 1900, to February 15, 1902, and thereafter, the Choctaw, Oklahoma & Gulf Railroad Company, the defendant in error, operated a line of railroad extending from El Reno, in the territory of Oklahoma, thence eastwardly through the territory of Oklahoma, the Indian Territory, and the state of Arkansas, to Memphis, Tenn. Coal fields existed along this line of road from South McAlester, in the Indian Territory, eastward to a point between Hartford and

Mansfield, both of the latter places being in the state of Arkansas, or for a distance altogether of about 100 miles. The defendant company made a practice of hauling coal taken from the mines contiguous to its road, which belonged either to itself or to other persons and corporations, and about 60 or 70 per cent. of its traffic was of that character. When a mine owner, other than the defendant company, desired to employ the defendant to haul his coal, he made application to that effect to the company, and if, on an examination of the applicant's mine by the executive officers of the railroad, the quantity of coal therein seemed to be adequate to justify the expense, the general practice was to enter into an agreement with the mine owner whereby the latter undertook to procure the right of way and grade a track leading from the railroad to his mine, and to supply the necessary ties, the railroad, on its part, agreeing to furnish the necessary iron and to lay the track, and thereafter keep the track and roadbed in good repair. It was also the usual practice in such agreements to require the mine owner to develop his mine so that it would supply a certain number of cars of coal per day, and to equip it with tipples and screens so that coal could be conveniently and speedily loaded into cars at the mine. In the month of September, 1900, the defendant's road in the vicinity of Hartford, Ark., had been recently constructed, and the volume of traffic at that station was small. The railroad company, before building its road eastwardly into the state of Arkansas, had bought about 1,600 acres of coal land near Hartford, and had located its station at that point on a part of the tract. The coal fields in that vicinity had been only slightly developed in the month of September, 1900, but there was one coal mine called Glenn's Bank that had been opened near the station to supply the local demand for coal, and after the railroad was opened for business, and during the fall of the year 1900 and the winter of 1901, the parties controlling this mine were allowed to haul coal to the station by wagons and load it on cars that were set out upon a side track. The plaintiff at that time was also in possession of a mine near the station, and at his request, and as the traffic at the station was not large, he was accorded the same privilege of loading coal from wagons into cars standing on the house track, which privilege he continued to exercise until the spring of the year 1901, up to which time, during a period of seven or eight months, he had loaded altogether something over 300 cars. During the period in question the railroad company did not permit coal to be loaded from wagons into cars standing upon its sidetracks at any of its stations, except at the Hartford station, and at one other station called Red Oak, in the Indian Territory, at which latter place, as it seems, the practice was pursued temporarily until a spur track could be completed to the mine, which was some distance from the railroad. The defendant gave permission to load coal from wagons at Hartford mainly, if not entirely, for the purpose of aiding in the development of the coal measures at that point, but with no intention on its part of receiving coal permanently in that way, or of permitting its station side tracks to be used continuously for the purpose of standing coal cars thereon to be loaded from wagons. Some time in the spring of the year

1901, or the early summer of that year, the plaintiff was advised, by officers of the railroad company, that the practice of setting out cars on the station side tracks to be loaded from wagons would have to be discontinued. Thereafter there were several interviews between the plaintiff and persons representing the railroad company relative to the construction of a spur track to the plaintiff's mine for his benefit and accommodation. The railroad company appears to have been willing at all times to lay such a track and to furnish the iron therefor, provided the plaintiff would secure a right of way and do the grading. The plaintiff on his part appears to have been willing at first to accept this proposition. They differed, however, as to the place where the spur track should connect with the main line of the road; the plaintiff insisting that the connection should be made at the station house at Hartford, and the defendant objecting to a connection at that point. The negotiations looking to the construction of a spur track accordingly fell through, and on August 15, 1902, the defendant company peremptorily declined to permit cars to be further loaded from wagons at its station or house track, the reason assigned for such action being, in substance, that it was the universal practice of all railroads engaged in hauling coal to require mine owners and coal shippers to have tipples and tracks whereby coal could be speedily loaded direct from the mines, and because of the annoyance, inconvenience, and delay necessarily attendant upon the loading of coal cars from wagons at stations. The plaintiff thereafter made complaint concerning the defendant's action to the board of railroad commissioners of the state of Arkansas, and in view of threatened action by that body the defendant company on October 7, 1902, again permitted cars to be loaded at the Hartford station from wagons, provided the coal so loaded was consigned to points within the state of Arkansas. At a later date, in January, 1902, for the same reason —that is to say, because of action taken or threatened to be taken by the board of railroad commissioners for the state of Arkansas, and to avoid the possible assessment of heavy penalties—the order against loading from wagons at the Hartford station, as respects coal consigned to any point on the defendant's railroad, either within or without the state of Arkansas, was revoked.

The fundamental question which this state of facts presents would seem to be whether the defendant company, by setting out coal cars on its house track at Hartford, and permitting them to be loaded from wagons for a period of several months, under the circumstances above detailed, thereby obligated itself to continue that practice, and was guilty of a legal wrong when it discontinued it in August, 1901. Undoubtedly a common carrier must accept and transport all commodities that are tendered to it for carriage which it holds itself out to the world as engaged in carrying, provided a reasonable compensation for the service is also tendered. Unlike a private carrier, it is not entitled to choose its patrons or customers, but, being a quasi public servant, must serve everybody who chooses to employ it, and must treat them impartially, charging each the same rate for substantially the same service, and affording to each the same facilities for shipment. A common carrier, however, is not bound by the

125 F.—29

rules of the common law to receive and carry commodities of any and every kind which may be offered to it, but only such as it makes a practice of transporting. It is entitled in the first instance to determine what class of commodities it will engage in carrying. Moreover, it is entitled, in the first instance, by the common law, to establish reasonable rules and regulations governing the manner and form in which it will receive such articles as it professes to carry, and providing how they shall be packed for shipment so that they may be handled and transported conveniently, safely, and expeditiously. Hutchinson on Carriers, §§ 111–113, and cases there cited. This power to make reasonable regulations with respect to the manner in which it will receive commodities for transportation implies the existence of a power on the part of a common carrier to change or modify such regulations from time to time upon reasonable notice to the public, as otherwise it might be compelled to pursue a particular practice of receiving goods which it had once adopted, and was at the time attended with no inconvenience, after that practice had become exceedingly inconvenient and burdensome both to itself and the public. It is manifest, we think (indeed, so manifest that we might almost take judicial notice of the fact), that no railroad constructed through extensive coal fields and engaged in transporting coal to market could for any considerable period follow the practice of setting out cars on its station side tracks, some distance from the place where coal is mined, and permitting coal to be hauled thence by wagons and loaded into the cars by the slow process of shoveling. The useless consumption of time, and the additional expense incident to the handling of the commodity in question, in large quantities, in that primitive manner, would occasion great public loss and inconvenience, to say nothing of the loss sustained by the carrier, and the serious manner in which that method of handling coal would interfere with the movement of its trains and the transaction of its other business. In the case at bar one of the witnesses testified, in substance, that, if all the coal tributary to the defendant's railroad was loaded by wagon, the mines would not produce 20 per cent. of their present output because of the impossibility of handling the output in that way. This is in itself an entirely reasonable statement, and no attempt was made by the plaintiff to disprove it; his contention being apparently that, because the defendant had permitted him to load coal from wagons for a few months, it had deliberately chosen that method of receiving coal and serving the public, and was bound perforce to continue the practice indefinitely. We are of opinion that this contention on the part of plaintiff is untenable, and should be overruled. The evidence shows without contradiction, as heretofore stated, that the practice of permitting a shipper of coal to load cars from wagons at stations obtained at no other station along the defendant's road save at Hartford and Red Oak, where the practice was tolerated temporarily, and for special reasons, with no thought of pursuing it permanently. The great bulk of coal that the defendant received and transported over its road was loaded by means of tipples into cars standing on spur tracks which had been laid to the mines, and in so far as the defend-

ant had held itself out to the world as a common carrier of coal it. can only be said to have so held itself out provided the commodity was so delivered and loaded. We entertain no doubt that the defendant had the right to abandon the method of receiving coal which it had adopted at Hartford when the conditions that led to the practice at that station had so far changed as to render its further continuance inconvenient and burdensome. Especially should this right be conceded to the defendant when we reflect that if it permitted coal to be hauled to that station in wagons, and thence loaded into cars, other mine owners along its line might and probably would assert the same privilege, thereby subjecting it to great loss and expense, besides putting the public to much inconvenience. That conditions had materially changed at the Hartford station between September, 1900, and August, 1901, admits of no controversy. It was proven at the trial, and not denied, that in the meantime the defendant had disposed of its coal land at that point; that several large mines had been opened in the immediate vicinity of that place; that the station had become a large shipping point for coal; that the volume of traffic at that place, as well as along the road generally, had largely increased during the year; that the demand for cars in August, 1901, to handle coal and other products which required shipment, was far greater than during the previous year; and that the public interest, as well as the interest of the carrier, demanded that there should be as little delay as possible in loading cars. Under these circumstances, we think that the defendant incurred no liability in refusing to permit its station side track to be further used for loading coal cars from wagons. Nor do we find that when the trial below ended any issue of fact as respects this point remained to be settled or decided by the jury, since all the material facts upon which the defendant's right to terminate the practice of loading cars from wagons depended were practically undisputed, and the existence or nonexistence of that right was a question of law to be determined by the court.

In the second count of his complaint, as before shown, the plaintiff sought to recover damages because, as he alleged, the defendant had given an undue and unreasonable preference to other shippers of coal at the Hartford station. The facts upon which this charge was based were likewise undisputed, and are as follows: The order prohibiting the loading of coal from wagons into cars standing on the house track extended to all shippers of coal without discrimination, and was not confined in its operation solely to the plaintiff or any one else. But while the embargo existed other mine owners who had constructed spur tracks to their mines, as well as tipples for the convenient and speedy loading of cars, were supplied with cars, and during the period in question it seems that some of the parties who had constructed private spur tracks did load some coal from wagons into cars that had been set out on such private spur tracks. This was done, however, as the evidence discloses, only to a limited extent, and for the purpose of disposing of such coal as was taken out at first in the process of opening a mine. The practice was not continued when a mine was fully opened and tipples had been located and built. The charge of giving other mine owners an undue preference is founded

upon the facts aforesaid, which the evidence tended to establish, and none other. We are of opinion that they do not establish a case of undue preference within the meaning and intent of the statute of Arkansas (Laws 1899, p. 89), which declares, in substance, that it shall be unlawful for a common carrier "to make any preference in furnishing cars or motive power" for the transportation of persons or property. The idea conveyed by the word "preference" is that, as between two persons occupying the same situation or relation to the carrier, one has been preferred over the other or granted certain privileges or facilities that were not extended to the other. Such is not the case which the evidence discloses. The plaintiff had not provided himself with a spur track leading to his mine for the storage of cars, while other shippers had done so. He desired to make use of the defendant's side track to stand cars thereon while he loaded them by the slow process of hauling coal to the station in wagons and shoveling it thence into the cars. The privilege which he demanded was essentially different from that accorded to other shippers who had built spur tracks on which cars could be placed and handled by the defendant with much less inconvenience and risk than when standing on its house tracks, which it used for handling other commodities, and for switching purposes, and probably used at times for the passage of trains. We fail to see how the delivery of cars to other shippers of coal on spur tracks which they had caused to be built can be fairly said to have been a preference extended to them, or a discrimination against the plaintiff, who desired to use the defendant's house tracks. The privilege which the plaintiff demanded was not accorded to other shippers nor a substantially similar privilege. We think, therefore, that he has no just cause for complaint on this ground.

The views which we have thus far expressed are confirmed by the decision in Oxlade v. North Eastern Railway Company, 15 Common Bench (N. S.) 680, which is frequently cited as an authority and may be justly esteemed a leading case. The decision in that action was under the canal and traffic act of 1854 (17 & 18 Vict. c. 31), which in broad terms declared "that every railway company * * * shall afford all reasonable facilities for the receiving and forwarding and delivering of traffic * * *; and no such company shall make or give any undue or unreasonable preference or advantage to * * * any particular person or company * * *; nor shall any such company subject any particular person or company or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." It appeared that the railway company made a practice of carrying coal in very large quantities, but for convenience in handling the large amount of traffic over its road it made a practice of carrying coal for colliery owners only, from the pit's mouth to stations where such colliery owners had cells appropriated to their use for the reception and sale of their coal. The complainant was a coal merchant, and on a certain day he tendered 16 cars or trucks loaded with coal to the railway company at one of its stations, to be forwarded to three other stations on its road where the complainant had no cell or siding appropriated to his special use for the reception of his coal trucks and the sale of coal. The railway

company declined to receive and haul his trucks, although they were in a fit and proper condition to pass over its road, whereupon he sought to compel the company to do so. The court held, in substance, that owing to the large amount of traffic in coal over the company's road it had an undoubted right to say that it would haul coal for colliery owners only who had acquired the requisite facilities for receiving and disposing of coal promptly on arrival at its destination, as otherwise the carrier would not have the necessary control over its road. The court further observed that, if the privilege demanded by the complainant was accorded to him, it would have to be accorded to all other persons, and would deprive the carrier of the benefit of an arangement which it had devised to insure the safe and convenient operation of its road. The case in question accordingly decides, in effect, that notwithstanding the broad inhibitions contained in the English traffic act, a carrier whose business consisted in part of hauling coal in large quantities was entitled to make regulations with respect to the manner of receiving and transporting it so that it might be handled expeditiously, safely, and economically without any unnecessary interference with the carrier's other business. It follows, of course, that regulations made by a carrier which have these objects in view, and are well designed to promote them, cannot be complained of on the ground that they operate as a preference in favor of one who does comply with them or as a discrimination against those who do not.

On the trial of this case in the lower court one of the questions which appears to have been discussed and decided by the learned trial judge (vide 118 Fed. 169, 172) was whether the defendant company was under an obligation to put in a switch or spur track for the plaintiff's convenience at such place as he desired. In their brief counsel for the plaintiff in error say that they will not discuss this question, because the plaintiff did not bring his action on account of any failure of the defendant company to put in a switch, but for the other alleged wrongs heretofore considered. Besides, the evidence does not show, we think, that the defendant did decline to put in a switch or spur track for the plaintiff on the same terms that it was in the habit of putting in such tracks for other shippers. This latter question, therefore, according to the concession of counsel, is not before this court for determination or consideration.

Another question, however, has been debated by counsel for both parties at some length, and that is whether the Arkansas statute, above cited, and other statutes of the state of a like nature, have any application in determining the rights of common carriers and shippers of coal as respects coal which is tendered to the carrier for shipment to points outside of the state. The plaintiff in error maintains the affirmative of this proposition, while the defendant in error maintains the negative; contending in effect, that the local law is applicable only as respects coal that is tendered for shipment to points within the state, and that if intended to apply to shipments to other states and territories would be invalid as amounting to a regulation of interstate commerce. We have found it unnecessary to consider or determine that question, holding, as we do, that the acts proven to

have been committed by the defendant company were not a violation of the local law or the common law. Learned counsel for the plaintiff ·in error concedes in his argument, and in that view we concur, that it is immaterial in the case in hand "whether it be considered that the common law controls or whether the statute controls." The local statute (section 6193, Sandels & H. Dig. Ark.), which declares that railroad companies "shall furnish sufficient accommodations for the transportation of all such passengers and property as shall, within a reasonable time previous thereto, offer or be offered for transportation at the place of starting and the junctions of other railroads, and at sidings and stopping places established for receiving and discharging * * * passengers and freights, and shall take, transport and discharge such passengers and property at, from and to such places on the due payment of tolls," etc., cannot be understood as depriving the carrier of the right to make reasonable regulations applicable alike to all persons and corporations relative to the manner in which such a commodity as coal shall be delivered for transportation, nor as compelling the carrier to set out on its side tracks at stations coal cars to be there loaded by means of wagons. That view of the statute, if it was adopted, would deprive the carrier of the power to serve the public in the most efficient, speedy, and economical manner, and it will not be presumed that such was the purpose of the Legislature. If the statute in question operates to modify the common law, it only modifies it, we think, to the extent of compelling railroads to carry all kinds of property which is tendered for carriage instead of such property as they make a public profession of carrying. It does not deprive railway companies of the right to make such reasonable regulations concerning the manner in which an article like coal shall be delivered as are conducive alike to the successful operation of its road and to the public welfare.

We are of opinion that the case was rightly decided below, and the judgment is accordingly affirmed.