F. H. PEAVEY & CO. et al. v. UNION PAC. R. CO. et al.

DIFFENBAUGH et al. v. INTERSTATE COMMERCE COMMISSION
(CHICAGO & A. R. CO. et al., Interveners).

(Circuit Court, W. D. Missouri, W. D.    March 3, 1910.)

Nos. 3,405, 3,437.

*(Syllabus by the Court.)*

**1.** COMMERCE (§ 93*)—INTERSTATE COMMERCE ACT—PARTIES TO SUITS TO AVOID ORDERS OF COMMISSION NOT NECESSARILY PARTIES TO PROCEEDINGS BEFORE COMMISSION—INTERVENTION.

Parties injuriously affected by the orders of the Interstate Commerce Commission may lawfully institute suits in the Circuit Courts to enjoin, suspend, or annul such orders, although they were not parties to the proceeding before the commission on which the orders are based.

Parties similarly situated may intervene in such suits.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 93.*]

**2.** COMMERCE (§ 91*)—INTERSTATE COMMERCE COMMISSION—JURISDICTION OF COURTS TO RELIEVE FROM ITS ORDERS.

The wisdom or expediency of the lawful discharge of the administrative duties of the Interstate Commerce Commission is not reviewable by the courts.

But the courts may relieve from orders of the commission which deprive complainants of their property without due process of law, or take it without just compensation, from those which are beyond the delegated power of the commission and from those which evidence so unreasonable an exercise of its power as to be substantially without, though formally within, it.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 91.*]

**3.** COMMERCE (§ 85*)—INTERSTATE COMMERCE COMMISSION—ORDERS PROHIBITING PAYMENT OR ALLOWANCE FOR ELEVATION AND TRANSFER IN TRANSIT BEYOND THE POWER OF THE COMMISSION.

Orders of the commission which prohibit the allowance or payment by carriers of all compensation to owners and operators of elevators for elevation and transfer in transit are beyond the delegated power of the commission.

An order which forbids a carrier to allow or pay to the owner of an elevator any compensation for elevation in transit of grain which he ships, unless he refuses to clean, clip, mix, inspect, or grade the grain while it is passing through the elevator, is beyond the power of the commission.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 85.*]

Bills by F. H. Peavey & Co. and others against the Union Pacific Railroad Company and the Interstate Commerce Commission, and by Harry J. Diffenbaugh and others against the Interstate Commerce Commission, the Chicago & Alton Railroad Company and others, intervening. Decrees for complainants.

Frank Hagerman (M. B. Koon, George T. Bell, and John Barton Payne, on the brief), for complainants.

Arba S. Van Valkenburgh and P. J. Farrell, for Interstate Commerce Commission.

F. C. Dillard and Edson Rich (N. H. Loomis and R. W. Blair, on the brief), for Union Pac. R. Co.

Frank Hagerman and John Barton Payne, for interveners.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

SANBORN, Circuit Judge.    Has the Interstate Commerce Commission the power to prohibit railroad companies from paying to the owners and lessees of elevators all compensation for the elevation of grain in transit?

Until June 29, 1908, repeated decisions of the commission and the practice of carriers and shippers had been consonant with a negative answer to this question.    In the Matter of Allowances to Elevators by the Union Pacific R. R. Co. (June 25, 1904) 10 Interst. Com. R. 309, 324, 325, 326; In re Hearing on Petition of Chicago Great Western Ry. Co. et al. (April 9, 1907) 12 Interst. Com. R. 85, 89; City Council of Atchison v. Missouri Pacific Railway Co. (April 29, 1907) 12 Interst. Com. R. 112, 114; Consolidated Forwarding Company v. Southern Pacific Company (April 19, 1902) 9 Interst. Com. R. 182, 206e; American National Live Stock Ass'n & Cattle Raising Ass'n of Texas v. Texas Pacific Ry. Co. (March 7, 1907) 12 Interst. Com. R. 32, 36; Central Yellow Pine Ass'n v. Vicksburg, Shreveport & Pacific Ry. Co. (March 19, 1904) 10 Interst. Com. R. 193, 211, 213; In the Matter of Unlawful Rates and Practices in the Transportation of Cotton by the Kansas City, Memphis & Birmingham R. R. Co., 8 Interst. Com. R. 121, 136, 139, 140; Merchants' Cotton Press & Storage Co. v. Interstate Commerce Commission (June 24, 1909) 17 Interst. Com. C. R. 78, 99, 101, 103, 105; Kentucky Railroad Commission v. L. & N. R. R. Co., 10 Interst. Com. R. 173.

On June 29, 1908, the commission gave an affirmative answer to the question before us, and issued orders which in terms forbade the Chicago, Burlington & Quincy Railroad Company, the Missouri Pacific Railway Company, the St. Louis & San Francisco Railroad Company, the Chicago, Rock Island & Pacific Railroad Company, and the Missouri, Kansas & Texas Railroad Company, and in effect forbade the Union Pacific Railroad Company, to pay or allow to the owners or lessees of elevators at Omaha, Kansas City, and other cities on the Missouri river, any compensation whatever for the elevation of grain in transit at those points, and on October 16, 1908, announced that the principle of the decision upon which these orders are based applies everywhere, and that the commission expects that it will be universally accepted by carriers throughout the nation.    In the Matter of Allowances to Elevators by the Union Pacific R. R. Co., 14 Interst. Com. C. R. 315; Traffic Bureau Merchants' Exchange of St. Louis v. Chicago, Burlington & Quincy R. R. Co., 14 Interst. Com. R. 317, 331, 510.

Mindful of the fact that this ruling and these orders were subversive of former decisions and of an approved course of business thereunder in reliance upon which hundreds of thousands of dollars had been invested in elevators and facilities for the transfer of grain, that great grain markets had been established near the producers upon the Missouri river at the termini of railroad systems, and that the parties in interest desired a review of the legal issue presented, the commission postponed the effective date of the orders until the suits in hand could be brought to final hearing.

It may not be unprofitable, before entering upon the discussion of the question at issue, to call to mind a few general propositions of law, the general situation of the parties, the business, and the transportation out of which this issue arises.

Every railroad company has the right to insist that its cars shall be unloaded at the termini of its railroad and that their contents destined to points beyond shall be loaded into cars or other vehicles of the connecting carriers. Elevation and weighing in the elevator are indispensable means of the transfer of grain from the cars of one carrier to those of another under the existing conditions and methods of transportation through our large cities. There is neither time nor space nor labor for the shovel or any other method of transfer, or for weighing in the car or any other method of weighing. The operators of elevators weigh and certify to the weight of grain as it passes through their elevators, or it is weighed in the elevators, and its weight is certified by some official of the state or of some grain exchange or other association, and these certificates are accepted as conclusive evidence by carriers, shippers, and dealers alike. Elevation consists of the unloading of grain from cars or vessels into elevators and the loading of the grain out again into cars or into other vehicles. As elevation is indispensable to weighing in the elevator, if the prohibition of compensation for elevation in transit shall prevent the elevation of the grain at the Missouri river, it will also prevent the weighing there, so that the inhibition at issue in these cases really involves transportation services both in elevation and in weighing in transit.

"All services in connection with the * * * elevation * * * of the property transported" are transportation. Act June 29, 1906, c. 3591, §§ 1, 2, 4, 34 Stat. 584, 586, 589 (U. S. Comp. St. Supp. 1909, pp. 1150, 1153, 1158), to amend Interstate Commerce Act Feb. 4, 1887, c. 104, §§ 1, 6, 15, 24 Stat. 379, 380, 384 (U. S. Comp. St. 1901, pp. 3154, 3156, 3165). Railroad companies are required to furnish these services upon request (section 1); to state separately in their schedules their charges therefor (section 6 as amended), and if such services are rendered by the owner of the property transported the charge and allowance therefore may not be more than is just and reasonable (section 15 as amended). The allowance for the elevation of grain here in question was three-fourths of a cent per hundred pounds. It was separately stated in the schedules of the carriers, and was allowed only upon grain received into the elevators from cars coming from the west which was shipped out of the elevators into cars bound east, north, and south. The same services in elevation were offered to all shippers, and the same allowance was made to all operators of elevators, whether they were or were not the owners of the grain transported.

More than 90 per cent., nearly all, of the grain brought to the Missouri river passes on to destinations east, north, and south. This grain takes the local rate from points west of the Missouri river to the river and from the Missouri river to the Mississippi river, and to points beyond it takes the proportional rate, which is less than the local rate upon a certificate that it has come from points west of the Missouri river.

In 1907, 209,728,650 bushels of grain were handled in and out of

Omaha, Kansas City, Atchison, and St. Joseph. Since January 1, 1904, more than $3,000,000 have been invested in elevators in those cities for the purpose of handling this grain.

The Union Pacific Railroad Company has railroads extending into and through the grain fields of Kansas and Nebraska, and its eastern termini are at Kansas City and Council Bluffs, which for the purpose of this opinion is included in the general term "Omaha." The greater volume of the grain moves from the fields in Kansas and Nebraska each year to the Missouri river in a few months in the autumn and winter. The portion of that grain which a railroad company can haul depends upon the number of box cars it can use for this purpose during this small portion of the year. The Union Pacific Company has the short haul. It is in competition with companies that have railroads from these grain fields through Missouri river points to and beyond the Mississippi river. They can carry this grain profitably on their own cars and rails east as well as west of the Missouri river without elevation; but it is requisite to the profitable use by the Union Pacific Company of its equipment that the grain be elevated out of its cars at the Missouri river, and that the cars be sent back west for new loads promptly. If it permits these cars to pass on east over connecting lines, they will be absent when their use upon its railroads is most needed and is most profitable; it will lose a large share of the traffic in this grain and of the revenue which it could earn by the use of its cars upon its own tracks. Thus the elevation of the grain at Omaha and Kansas City is necessary to the reasonable competition and participation of the Union Pacific Company in this transportation.

The Chicago Great Western Railroad Company, and other companies, whose western termini are at Missouri river points, are in a like situation. The elevation of the grain at those cities is equally indispensable to their participation in this traffic. They can get no grain into their cars at Omaha and Kansas City unless it is first taken out of the cars which bring it from the west to the river.

On the other hand, carriers that have railroads from the grain fields of Nebraska and Kansas through the Missouri river cities to the north, east, and south are interested to prevent elevation at the river, because the companies whose railroads terminate there cannot compete with them successfully in the absence of this facile means of transfer of the grain from the cars of the company west of the river to those of the company east of it.

But perhaps the parties most deeply interested in the issue before us are the owners, lessees, and operators of the elevators at the Missouri river cities and at all other cities in the nation where great terminal elevators have been constructed. For years carriers have used these elevators and have paid their owners and lessees for the transfer of the grain through them, and the latter have invested large amounts of money in the construction of these buildings, and in the establishment of markets near the grain fields that may be seriously affected if this practice is declared to be unlawful and is henceforth prohibited.

In 1899 the Union Pacific Company, mindful of the necessity of unloading its cars of grain at the eastern termini of its roads and of

promptly returning them westerly for new loads, requested Mr. Frank H. Peavey to construct and operate an elevator for this purpose at Council Bluffs. He consented and made a contract with the company to build and operate an elevator with a capacity of 1,000,000 bushels, and to unload, store for 48 hours, and reload grain to the capacity of his elevator for the Union Pacific Company, and that company contracted to pay him not exceeding 1¼ cents per 100 pounds for the first 10 years and 1 cent per 100 pounds for the second 10 years for this service. He built an elevator of the capacity specified in the year 1899, at an expense of $200,000, in reliance upon this contract, and this elevator has ever since been operated thereunder by reason of this agreement. Mr. Peavey assigned his contract to the complainant Omaha Elevator Company, a corporation, and an average of over 600,000,000 bushels of grain passes through the elevator annually. Another elevator now owned and operated by the complainant the Midland Elevator Company, through which an average of more than 2,500,000 bushels of grain passes annually, was built, and is operated at Kansas City, under a like contract. The complainant F. H. Peavey & Co. is a corporation. It owns nearly all the stock of the two elevator companies, and henceforth the contracts, the elevators, and their rights and interests will be treated as those of Peavey & Co. Peavey & Co. owns many country elevators on the railroads of the Union Pacific Company and is a purchaser and shipper of most of the grain which passes through its terminal elevators.

On June 25, 1904, after an investigation of these contracts and of the practice of the Union Pacific Company to allow Peavey & Co. 1¼ cents per 100 pounds for the elevation of its own grain, as well as that of others, and after consideration of the contentions then made that this allowance gave it opportunities to violate the prohibition of rebates (10 Interst. Com. R. 320), that it secured thereby the commercial advantages of treating the grain, that is, of cleaning, clipping, inspecting, mixing, and grading it during its elevation, which shippers who had no terminal elevators did not receive (page 325), the commission held that the contracts were made in good faith, that the allowance was reasonable, and that no requirement of the law had been disregarded in their making or their performance (pages 321, 326).

On April 9, 1907, after a rehearing on the petition of the Chicago Great Western Railway Company and others, the commission held that an allowance to the owner of an elevator of more than the cost of elevation for the service of elevating his own grain wrought a preference and a rebate, that three-fourths of a cent per 100 pounds was not in excess of the cost of elevation and would return no profit to Peavey & Co., and it ordered the allowance made to it by the Union Pacific Company reduced to that amount. 12 Interst. Com. R. 85. In all other respects the commission adhered to and reaffirmed its former ruling. It held that elevation is a facility which a carrier may provide for the benefit of shippers if it finds it to its interest so to do, that this facility must be open to all on equal and reasonable terms, that a railroad company may construct elevators itself or make an arrangement with the owner of an elevator to furnish elevation facilities (page 87), and that

the commission has no power under the acts of Congress to forbid a railroad company from contracting with an owner of an elevator, who is also a shipper, for such facilities, but that its authority extends to such regulation and control of the relations between them as will protect the rights of others and enforce the observance of the law (page 89).

The Union Pacific Company, in 1906, extended to all elevators at Omaha and Kansas City the allowance it made to Peavey & Co. Its official published schedules have provided since June 27, 1906, that "to expedite the movement and to secure the prompt release and return of equipment an allowance of (1¼ cents prior to June 1, 1907, and ¾ of a cent since that date) per hundred pounds will be made by the Union Pacific Company to the elevators performing the service on grain in car loads transferred by the elevators at South Omaha, Omaha, Council Bluffs and Kansas City, subject to the following conditions": (1) All grain must originate west of these cities upon the railroads of and be transported to these cities by the Union Pacific Company; (2) the allowance will be made on grain which moves to points beyond Council Bluffs or Kansas City only; (3) no allowance will be made when more than 48 hours elapse between the time of delivery of loads by the Union Pacific Company to the elevator or connecting lines and the release and return of the empty cars to the Union Pacific Railroad. It will be noticed that the schedules and practice of the company offered this allowance to all elevators at the eastern termini, and this elevation to all shippers whose grain went beyond its termini for the same rate of compensation, whether they were owners of elevators or not, and that it made this offer to induce the prompt return of its cars to the western grain fields.

On June 29, 1908, upon a second rehearing, the commission held that any allowance to Peavey & Co. for the elevation of the grain which it shipped through its terminal elevators was an undue preference, and therefore unlawful, because by the use of these elevators it secured at the same time with the elevation the commercial advantages of cleaning, clipping, inspecting, mixing, and grading the grain, which were no part of transportation. 14 Interst. Com. C. R. 315, 316. It, accordingly, ordered that the Union Pacific Company cease "from paying any allowance to Peavey & Co. on grain belonging to them, or in which they have any direct or indirect ownership or interest, that has been mixed, treated, weighed, or inspected in any of their said elevators at Kansas City and Council Bluffs." Under this order it will be seen that Peavey & Co. may collect the allowance for the elevation of its grain from the Union Pacific Company on condition that it uses its terminal elevators for the purpose of elevating this grain alone. It may treat its grain at other elevators, then ship it through Omaha and Kansas City, elevate it there, and receive the allowance for elevation on condition that it does not again treat it there. Peavey & Co. and its elevator companies have continued to elevate the grain which they shipped through the termini of the Union Pacific Company, and to return the empty cars in accordance with their contracts and the schedules of the Union Pacific Company; but the latter corporation has re-

fused to allow or to pay them anything for these services which have been rendered since the last order of the commission, and the complainants have brought and prosecuted their suit to enjoin the enforcement of this order and to recover of the Union Pacific Company compensation for this elevation.

Late in the year 1907, the Traffic Bureau, a department of the Merchants' Exchange of St. Louis, an association operating under the laws of Missouri, to promote the commercial interests of that city, filed petitions against Chicago, Burlington & Quincy Railroad Company, Missouri Pacific Railway Company, St. Louis & San Francisco Railroad Company, and Missouri, Kansas & Texas Railway Company, corporations which own through lines of railroad from the grain fields of Kansas and Nebraska to points east of the Missouri river, and which were interested to prevent elevation of grain at Missouri river points, but were making the same allowances for elevation there that were made by the Union Pacific Company in order to meet the latter's competition, and prayed that the commission would abolish this allowance for elevation, and on June 29, 1908, the same day that it made the order in the case of the Union Pacific Company, the commission ordered these railroad companies to abstain "from giving or paying three-fourths of a cent per hundred pounds, or any other sum, as an allowance or compensation for service rendered in the elevation of grain at Kansas City, Mo., and other Missouri river points." 14 Interst. Com. R. 317, 331. Parties who represented the complainants in the second case under consideration applied to the commission to grant them a hearing, but this was denied them, and the commission said.

"A cardinal consideration in our conclusion was the belief that in no way could discrimination and preference be prevented except by a complete prohibition of these payments and privileges. The principle of our decision applies everywhere. We expect that the decision will be universally accepted." 14 Interst. Com. R. 510.

The interstate commerce act authorizes incorporated boards of trade of cities and associations of like character to apply to the commission for relief (24 Stat. 383, § 13), and such corporations and members representing such associations may likewise apply to the court for relief from injuries unlawfully inflicted by the commission.

Thereupon Harry J. Diffenbaugh, Edmund D. Bigelow, and Charles W. Lonsdale, the president, secretary and chairman, respectively, of the transportation committee of, and who were authorized to represent, the Board of Trade of Kansas City, which is an association of 200 members consisting of operators of grain elevators, millers, and dealers in grain who handled a total of 11,334,050 bushels of grain of the value of $70,739,930 in the year 1907, the Omaha Grain Exchange, a corporation whose members are engaged in the same business and interested in this order in the same way at Omaha, the St. Joseph Board of Trade, a corporation, and certain individuals representing the Atchison Board of Trade, exhibited their bill against the commission, wherein they set forth the material facts which have been recited, alleged that this order of the commission was violative of the Constitution, beyond the powers of the commission, and that its enforcement would depre-

ciate the value of their elevators and their investments in these and other facilities for the transfer, purchase, and sale of grain in their cities by depriving them of compensation for its transfer, would draw away from their cities to eastern, northern, and southern marts a large volume of their grain business, and would tend to diminish the grain markets in their cities to their irreparable injury, and prayed for equitable relief. The commission demurred to this bill, and the argument on the demurrer was submitted at the final hearing of these cases.

At this final hearing a motion was made by the Chicago, Milwaukee & St. Paul Railway Company, the Wabash Railroad Company, the Chicago Great Western Railroad Company and the Chicago & Alton Railroad Company for leave to file intervening petitions in this Diffenbaugh Case, and this motion was submitted for decision. The petitions of these companies show that they own railroads whose western termini are at the Missouri river cities; that if they are denied the right to provide for the transfer and weighing of grain by making compensation therefor to the operators of elevators at these cities their railroad terminals and the elevators there, some of which are owned by one of these companies, will be greatly depreciated in value, the shippers and producers of grain on lines of railway which have their eastern termini at the Missouri river cities, in the shipment of their grain to points east, north, and south of that river, will be compelled to pay large sums of money for transferring and weighing their grain at the river, while producers and shippers of grain located on lines of railroad extending through those cities to the east, north, and south will incur no such expense, and will thus secure an undue preference; that the volume of grain which under the present allowance passes over the petitioners' lines of railroad will be diverted from their railroads to the through lines and from the markets at the Missouri river cities to eastern, northern, and southern cities; and that a similar depreciation of the values of terminal and elevator property and business and like diversion of grain and the traffic therein from established grain markets in the region between the Allegheny Mountains and the Missouri river will be effected if the prohibitive order of the commission is put into operation throughout the nation, and they ask that the prayer of the complainants in the Diffenbaugh Case be granted.

The demurrer to the bill of Diffenbaugh and his associates presents two objections: That the complainants were not parties to the proceeding before the commission upon which the order challenged is based; and that there is no equity in the bill. But this is a controversy between competitors in transportation and in trade, between the Traffic Bureau of St. Louis and the owners of the lines of railroad which extend from the grain fields of Kansas and Nebraska through the Missouri river cities upon one side, and the Boards of Trade, the owners of elevators and dealers of grain in the Missouri river cities and the railroad companies whose termini are at those cities on the other. The former are interested in opposition to the transfer of grain at those cities and to any allowance therefor; the latter are interested to promote the transfer of grain in those cities and to secure an allowance therefor. One of the parties opposed to this transfer, upon notice

to other parties who are equally opposed to it, and without any notice to any party in favor of it, has procured this final order of the commission, which prohibits the railroad companies from making any allowance for the elevation, necessarily deteriorates the value of the property, diminishes the volume and the profit of the business, strikes down profitable contracts, and destroys the right of parties in favor of the transfer to make such contracts. These parties have no remedy at law. Are they deprived of the right to equitable relief because those opposed to them did not cause them to be made parties to the proceeding or to be notified of the hearing before the commission upon which this order is founded? If so, parties may easily deprive those injuriously affected by such orders of all rel·f by making, as in this case, those having a like interest parties to the proceeding and excluding those who are interested in opposition to their interest. In such a case none of the parties to the proceeding may successfully maintain a suit to challenge the order, because none of their interests are irreparably or at all injured, and, if those whose interests are injuriously affected may not assail it, the order is impregnable.

This cannot be the true rule of right or of practice. A careful search of the interstate commerce act discloses no limitation of the parties who may maintain suits to enjoin, set aside, annul, or suspend an order of the commission to those who were parties to the proceeding before it upon which the order was based. The proceeding in the court is not an appeal; it is a plenary suit in equity. "The jurisdiction to hear and determine such suits" is vested in the Circuit Courts. Section 16, as amended (34 Stat. 592 [U. S. Comp. St. Supp. 1909, p. 1162]). The determination of the question what parties may maintain such suits is left by the interstate commerce act to the general rules and practice in equity, and under them any party whose rights of property are in danger of irreparable injury from an unauthorized order of the commission may appeal to a federal court of equity for relief. Such an order, issued without notice to the parties injuriously affected and without opportunity to them to present meritorious defenses, is not more conclusive than a judgment of a court, and Chief Justice Marshall declared in Marine Insurance Company v. Hodgson, 7 Cranch 332, 336, 3 L. Ed. 362, that:

"Any fact which clearly proves it to be against conscience to execute a judgment, and of which the injured party could not have availed himself in a court of law, and of which he might have availed himself at law, but was prevented by fraud or accident, unmixed with any fault or negligence in himself or his agents, will justify an application to a court of chancery." Hendrickson v. Hinckley, 17 How. 443, 444, 15 L. Ed. 123; Hungerford v. Sigerson, 20 How. 156, 161, 15 L. Ed. 869; Gaines v. Fuentes, 92 U. S. 10, 22, 23 L. Ed. 524; Barrow v. Hunton, 99 U. S. 80, 85, 25 L. Ed. 407; Johnson v. Waters, 111 U. S. 640. 667, 4 Sup. Ct. 619, 28 L. Ed. 547; Arrowsmith v. Gleason, 129 U. S. 86, 97, 98, 9 Sup. St. 237, 32 L. Ed. 630; Marshall v. Holmes, 141 U. S. 589, 596, 12 Sup. Ct. 62, 35 L. Ed. 870; National Surety Company v. State Bank, 120 Fed. 593, 598, 56 C. C. A. 657, 662, 61 L. R. A. 394.

The complainants in the Diffenbaugh Case are entitled to challenge the order of the commission in this court. The allegations in their bill that this order was beyond the power of the commission and will irreparably injure their property and their business present good ground

for equitable relief, and the demurrer of the commission must be overruled. For the same reasons, the petitions of the railroad companies that seek to intervene present substantial equities and their motion for leave to file them and to become parties to this suit must be granted.

The Interstate Commerce Commission is an administrative tribunal, and the wisdom and expediency of the lawful exercise of the discretion delegated to it under the Constitution and the statutes is not reviewable by the courts. But the power is vested in and the duty is imposed upon the Circuit Courts to relieve from orders of the commission which deprive complainants of their property without due process of law or take it without just compensation in violation of the fifth amendment to the Constitution, from orders which are beyond the limits of the power delegated by the acts of Congress to the commission and from orders which, though in form within its delegated power, evidence so unreasonable an exercise of it that they are in substance beyond it. Interstate Commerce Commission v. Illinois Central Railroad Company (Jan. 10, 1910) 215 U. S. 452, 30 Sup. Ct. 155, 54 L. Ed. ——; Interstate Commerce Commission v. Stickney (Nov. 29, 1909) 215 U. S. 98, 30 Sup. Ct. 66, 54 L. Ed. ——; s. c. (C. C.) 164 Fed. 638, 644; Missouri, Kansas & Texas Ry. Co. v. Commission (C. C.) 164 Fed. 645, 648.

Laying aside the question of the constitutionality of the orders challenged in these cases, let us consider this question: Has the commission been empowered to prohibit allowances and payments of compensation for the transfer by elevators of grain in transit? The statutes under which the commission acts require the rates for transportation, and hence for the elevation of grain in transit, to be just and reasonable. Elevation is a part of transportation which the law requires the carriers to provide, and for which it authorizes them to pay others reasonable compensation. The three-fourths of a cent per 100 pounds which the carriers now pay for this service at the Missouri river cities is a just and reasonable compensation for it. Whence comes the power of the commission to forbid this payment? From the facts, says the commission, that those who receive this compensation generally own the grain which they transfer and the elevators by means of which they transfer it, that they derive pecuniary advantages which those who do not own the elevators and also the grain transferred do not secure by treating, that is, by cleaning, clipping, mixing, and grading the grain as it passes through the elevators, thereby enhancing its value, and that there is danger that they may use the practice of allowing this compensation to violate the acts of Congress, to secure rebates and effect unjust discrimination. That although other considerations are mentioned in the opinions of some members of the commission, the facts above stated are the only ones upon which the commission relied to sustain their authority to make the orders in question, let its opinion upon the motion for another hearing (14 Interst. Com. R. 510), and the order in the case of the Union Pacific Company which permits it to make this allowance to Peavey & Co. on condition that the latter separates its elevation or transfer in transit from its treatment of the grain, witness.

But the legal presumption is that parties will obey the law and discharge their duties. Reasonable compensation for transfer service

may not be denied lawfully because there is a possibility that those who receive it may at some future time violate the law and secure rebates or effect discrimination. There is no more power in the commission to forbid carriers from paying or allowing for the elevation and transfer of grain in transit reasonable compensation because there is a possibility that a future violation of the law may arise out of such an allowance than there is to prohibit carriers from charging and receiving reasonable rates for transportation of all property, because there would be less danger of future rebates and discriminations if they were compelled to conduct transportation without compensation.

The treatment of the grain in the elevators, the cleaning, clipping, mixing, inspecting, and grading of it, is a trade service; it is no part of transportation and is not a transportation service. No power has ever been granted to the Interstate Commerce Commission to regulate, to prohibit, to separate by miles from the service of elevation and transfer in transit or from any other transportation service, or to interfere with this trade service. The advantages derived from it are of the same nature as those which the owners of mills enjoy who manufacture into flour in transit the wheat which they own and ship, who saw into lumber in transit the logs which they own and ship, and who dress in transit the rough lumber which they own and ship. They are of the same nature as those which the owners and shippers of cotton who practically own the compresses derive from compressing the cotton in transit, and yet in all these cases the carriers maintain, and the commission sustains, the same rates of transportation for the shippers who own the mills, the compresses, and the articles transported and the shippers who own none of these facilities of trade and derive none of the advantages thereof. See the authorities cited at the opening of this opinion. They are of the same nature as those which the owners of cars leased to a railroad company who are shippers of the articles transported therein may derive from that ownership. Consolidated Forwarding Co. v. Southern Railway Company, 9 Interst. Com. R. 182, 206e.

It is no part of the duty, nor is it within the power, of the commission to see that all shippers of like commodities derive the same measure of profit from their trade in and treatment of the articles which they ship, to see that a shipper who owns a warehouse, an industrial track, and private cars derives no greater profit from dealing in the groceries or other articles he ships than a shipper who has none of these facilities, to see that a shipper of coal who owns a tipple from which he loads it gains no greater profit from the handling of his coal than one who loads it from a wagon. Harp v. Choctaw, Oklahoma & Gulf R. Co., 125 Fed. 445, 61 C. C. A. 405. Pecuniary advantages derived by shippers from the ownership or use of such facilities of trade are attributable to that ownership, and not to the transportation of the articles shipped, and the consideration and regulation of these advantages are without the scope of the commission's power.

The truth is that trade advantages of this nature do not condition the questions of reasonableness of rates, of rebates, or of discrimination. The shipper who owns warehouses, tipples, spur tracks, cars, mills,

and by their use derives greater profit from the dealing in the articles which he ships over a railroad, is entitled to the same rate of charge for transportation and the same reasonable compensation for transportation services which he renders that the shipper who owns less or no such trade facilities and derives less profit is entitled to. The reasonableness of and the discrimination by the charge and the compensation is conditioned by the reasonable value of the service, not by the gain or the loss which the shipper derives from the use of the trading facilities he owns in the handling of the articles transported. The pecuniary advantages that result to the owners of elevators, who are also shippers of the grain, from its treatment in their elevators, are derived, not from the transportation of the grain nor from its elevation or transfer in transit through their elevators, but from their ownership or their operative control of the elevators, and their use of them in the conduct of their trade. They are therefore ultra vires the commission and immaterial to the issues whether or not the compensation or allowance to the owners of elevators who are also shippers is reasonable, unjustly discriminatory, or violative of the prohibition against rebates, and when these advantages are laid aside this compensation or allowance is neither.

That the commission is without power to prohibit carriers from paying or allowing to the owners of elevators reasonable compensation for elevating grain in transit which they own and ship is demonstrated by the course of decision and legislation that is crystallized in the amended interstate commerce act. Prior to 1906, that act contained no declaration that elevation or transfer in transit was a part of transportation, or that compensation might be charged or allowed therefor. After the commission had decided, in 1904, that the allowance by the Union Pacific Company of 1¼ cents per 100 pounds to Peavey & Co. for the elevation of the grain in transit, the larger portion of which Peavey & Co. owned and shipped, in the year 1905, the commission made this report and recommendation to Congress:

"Terminal roads, elevator charges and private cars.

"There is an important class of cases in which the owner of the property performs a part of the transportation service, where the carrier, by paying such owner an extravagant sum for the service rendered, thereby prefers him to other shippers of like property. This may happen in any case where the shipper is the owner of any of the facilities of transportation or performs any part of the transfer service. Such performance may take the form of an excessive division to a terminal road owned by the shipper, the payment of an excessive elevator charge to the owner of the grain; the payment of an excessive mileage upon the private car which conveys the property of the owner of the car. Our investigations leave no room for doubt that all these methods are at the present time more or less resorted to for the purpose or with the effect of preferring one shipper to another. It has been suggested that the Congress should prohibit railways from employing any agency or using any facility in the transportation of property which is furnished by the owner of the property. We hesitate to recommend at this time so drastic a measure as that. Assuming that such a law would be a constitutional exercise of authority, it would seriously interfere with property rights which have grown up under the present system. Moreover, there are many instances in which the services can be rendered or the facility furnished more advantageously both to shipper and railway and without injury to the public, if provided by the shipper itself. We do think, however, that the commission

should be empowered in a case of this kind, to determine whether the allowance to the property owner is just and reasonable compensation for the service rendered and to fix a limit which shall not be exceeded in the payment made therefor. Such a remedy would not be altogether adequate, and any remedy is extremely difficult of application, but nothing better appears to be available."

Thereupon the Congress amended section 1 of the act so that it provides that transportation shall include "all services in connection with the receipt, delivery, elevation and transfer in transit, ventilation, refrigeration, icing, storing and handling of property transported; and it shall be the duty of every carrier subject to the provisions of this act, to provide and furnish such transportation upon reasonable request therefor." 34 Stat. 584. Section 6, so that it provides that the schedules of rates required of the carriers shall "state separately all terminal charges, storage charges, icing charges and all other charges which the commission may require, all privileges or facilities granted or allowed." 34 Stat. 586. And section 15, so that it provides:

"If the owner of property transported under this act directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable, and the commission may, after hearing on a complaint, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the service so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided for in this section." 34 Stat. 590.

The contract of the Union Pacific Company with Peavey & Co., the decision of the commission thereon in 1904, and the report of the commission in 1905, had informed the Congress, and when these amendments were enacted the members of Congress were aware, of the trade advantages which naturally and necessarily resulted to a shipper from the ownership of cars, elevators, industrial tracks, compresses, and other facilities by which he transports his own property for a carrier and the danger of discrimination and of rebates from an "excessive division to a terminal road owned by a shipper, the payment of an excessive elevator charge to the owner of the grain and the payment of an excessive mileage upon the private car which conveys the property of the owner of the car"; and in the light of all this knowledge it prescribed the remedy and fixed its limit. It is that the charge and allowance to the owner of the elevator, who is also the shipper of the grain, shall be no more than is just and reasonable, and the limit of the power of the commission is to determine what is a reasonable charge as the maximum to be paid by the carrier for the service. Counsel argue that this view ignores the power vested in the commission to prevent rebates under section 2, and to repress regulations and practices of carriers that are unjustly discriminatory or unduly preferential under section 3 and section 15 of the amended act. But the permission granted by the amendment of 1906, to continue the known regulation and practice of allowing reasonable compensation for elevation and transfer in transit to shippers who were also the owners of elevators, and the clear limitation in that amendment of the power of the commission to the determination of the reasonableness of the allowances thus made,

was, in view of the knowledge of the Congress and of the common knowledge of the pecuniary advantages derived by such shippers from this practice, a conclusive legislative determination that, when the allowances were reasonable, neither the fact that the shipper of the grain was the owner of the elevator, nor the fact that he enhanced the value of his grain by treating it during the elevation and transfer in transit, constituted a rebate, an unjust discrimination, an undue preference, or a repressible danger of either. It was not only a clear withholding from the commission of the power, but an implied and effective prohibition of the commission, to forbid the allowance to such shippers and owners of reasonable compensation for the elevation and transfer in transit of their grain through their elevators.

Again, the allowance here in question was not a rebate because it was not a concession from the published schedules, but an allowance in accordance with them. If it had been discriminatory, it would have been because the entire rate of transportation charged by the carrier after this allowance was deducted would have been unduly preferential. But the allowance was only reasonable compensation for the service rendered, and the lawful remedy, if such discrimination existed, could not have been to deprive the owner of the elevator of such compensation for the service of transportation it was rendering and thereby of a beneficial use and of a portion of the value of its elevator. In Interstate Commerce Commission v. Stickney (Circuit Court, November 29, 1909) 164 Fed. 638, 643, 644, the Supreme Court affirmed an injunction against an order of the commission which reduced a reasonable terminal charge of $2 per car to $1 per car on the ground that the rate of the carrier plus the terminal charge was in its opinion unreasonably high, and held that the commission's remedy was to reduce the carrier's rate, and that it was beyond its power to reduce the terminal charge below reasonable compensation for the service. By the same mark it was beyond the power of the commission to prohibit the allowance or payment to the owners and operators of elevators of reasonable compensation for elevation because the carriers' rate, together with that payment or allowance, was discriminatory. The result is that the orders in these cases were beyond the power of the commission, and that they cannot be sustained.

Counsel have presented arguments upon which the orders of the commission and its announcement that the principle upon which they are founded will result in universal prohibition of payment to owners and operators of elevators throughout the land of any compensation for elevation obviously do not rest. But these arguments have also been carefully considered.

It is said that the grain upon which the allowance is made is not elevated or transferred in transit because it is shipped from points of origin in Kansas and Nebraska to the Missouri river upon local rates and local waybills. But a proportional rate is the balance of a through rate. There are proportional rates from the Missouri river to the Mississippi river and to points east, north, and south which are less than the local rates between those points, and this grain which comes from points west of the Missouri river takes, not the local, but these pro-

portional, rates east of the river upon the certificates or expense bills of the companies west of the river which show whence it came. Ninety per cent. of the grain which comes to the Missouri river points passes through them to points east, north, and south. The schedules of the carriers and their practice limit this elevator allowance or payment to grain coming into the elevators from the west which is actually loaded out into cars sent north, south, or east, and this service of unloading grain out of cars which have brought it from the west and loading it into cars which carry it to points east, north, and south is "elevation" and "transfer in transit" within the meaning of the amended interstate commerce act.

The rate of transportation from points west of the Missouri river through the cities upon that river to St. Louis and other eastern points is the same to all shippers. All shippers are offered the option of sending their grain through these cities with or without elevation for the same price. The railroad company pays out of the amount it receives from this uniform rate three-fourths of a cent per 100 pounds to the elevator men at the river for the elevation of that part of the transported grain which is elevated in transit there in consideration of a prompt return and full use of its cars. It is insisted that this constitutes a rebate and an unjust discrimination because the net amount retained by the carrier is three-fourths of a cent less on grain elevated than on that which is not elevated, and because the shipper who elevates his grain receives a service that he who does not elevate it fails to obtain. But this is not a rebate because there is no concession from the published rate here, but an allowance in accordance with that rate (section 2), and because the same service of elevation is offered to all shippers at the same price, and they are all able to accept it, and there is neither rebate nor unjust discrimination where such an offer is made, although some accept and others reject its advantages. Nicholson v. Great Western Railway Company, 1 Nev. & McN. 121, 125, 149.

Much is said in argument of discrimination and preference. While general expressions may be found in the opinions of the courts to the effect that there must be no difference in charges not based on difference in service and that the interstate commerce act was passed to secure equality of rates and to destroy favoritism (New York, New Haven & Hartford R. R. Co. v. Interstate Commerce Commission, 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515), the legal effect of the act is that declared by Judge Jackson, afterwards Mr. Justice Jackson of the Supreme Court, in Interstate Commerce Commission v. Baltimore & Ohio R. R. Co. (C. C.) 43 Fed. 37, in these words, which have been three times affirmed and adopted by the Supreme Court as the true interpretation of the law:

"Subject to the two leading prohibitions, that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference, or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at the common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are regarded as sound, and

adopted in other trades and pursuits." Interstate Commerce Commission·v. Cincinnati, New Orleans & Texas Pacific Ry. Co., 167 U. S. 479, 493, 17 Sup. Ct. 896, 42 L. Ed. 243; Cincinnati, New Orleans & Texas Pacific Ry. Co. v. Interstate Commerce Commission, 162 U. S. 184, 196, 197, 16 Sup. Ct. 700, 40 L. Ed. 935; Interstate Commerce Commission v. Baltimore & Ohio R. R. Co., 145 U. S. 263, 12 Sup. Ct. 844, 36 L. Ed. 699; Interstate ·Commerce Commission v. Alabama Midland Ry. Co., 168 U. S. 144, 173, 18 Sup. Ct. 45, 42 L. Ed. 414.

The act does not prohibit all preferences or advantages, or the production of all prejudices and disadvantages, but only those that are undue and unreasonable. Section 3, 24 Stat. 380; section 15, as amended, 34 Stat. 589.

It is contended that the allowance of the three-fourths of a cent to the owners of terminal elevators for elevation at the river constitutes a discrimination against the owners of elevators at St. Louis and points east and west of the river to whom no such allowance is made and who cannot treat the grain during this elevation in transit. But to the companies whose termini are at the Missouri river elevation in transit there is a commercial necessity for which they have a right to pay in order that they may secure their share of the transportation and the full use of their cars. For this service they pay three-fourths: of a cent per 100 pounds. The owners of elevators at other places cannot render this service and cannot treat this grain at these points; but they may do both and receive the compensation and benefit thereof by constructing elevators at the termini of the railroads at the Missouri river as those have done who do receive these benefits. The difference in allowance and in advantage is the just result of a difference in location and in the natural advantages of terminal elevators and cities upon the Missouri river, and it constitutes neither unjust discrimination nor undue prejudice. The Union Pacific Company and the Chicago Great Western Company, which have no railroads at St. Louis, certainly cannot be required to give to the owners of elevators and dealers in grain there the same advantages which they bring to those at the termini of their railroads. The Supreme Court, after a review of authorities, said:

"In short, the substance of all these decisions is that railways are only bound to give the same terms to all persons alike under the same conditions and circumstances, and that any fact which produces an inequality of conditions and a change of circumstances justifies an inequality of charge." Interstate Commerce Commission v. Baltimore & Ohio R. R. Co., 145 U. S. 263, 283, 12 Sup. Ct. 844, 36 L. Ed. 699; Harp v. Choctaw, Oklahoma & Gulf R. Co. (C. C.) 118 Fed. 169, 175; Id., 125 Fed. 445, 450, 453, 61 C. C. A. 405.

Railroad companies carrying wheat out of St. Louis allow for elevation at that city three-fourths of a cent per 100 pounds on grain shipped out to the south and to the southeast, and one-fourth of a cent per 100 pounds on grain shipped out to the east; but they allow and pay nothing for elevation upon grain shipped· into St. Louis from the west. Complaint. is made that the payment by the carriers of three-fourths of a cent per 100 pounds for elevation at Omaha and Kansas City works a discrimination between the dealer in grain who owns an elevator at St. Louis and the dealer who owns one at Omaha, in this, that if the former purchases grain west of the Missouri river, ships it through Omaha

to his elevator at St. Louis, and then out to some eastern point, it costs him three-fourths of a cent per 100 pounds more at that point than it would cost the dealer at Omaha who has passed the grain through his elevator. The answer is that the two dealers are not similarly situated. The Union Pacific Company and the Chicago Great Western Company neither reach St. Louis nor have their termini there. Their need for elevation in transit and their competition for transportation which constitute a controlling factor at Omaha and Kansas City do not exist at St. Louis, and that city is many hundred miles farther distant from the grain fields. These facts extract from this difference every element of unjust discrimination or undue prejudice. East Tennessee, V. & G. Ry. Co. v. Interstate Commerce Commission, 181 U. S. 1, 12, 21 Sup. Ct. 516, 45 L. Ed. 719; Interstate Commerce Commission v. Alabama Midland R. R. Co., 168 U. S. 144, 171, 175, 18 Sup. Ct. 45, 42 L. Ed. 414; Louisville & Nashville R. R. Co. v. Behlmer, 175 U. S. 648, 671, 674, 20 Sup. Ct. 209, 44 L. Ed. 309.

The allowance for elevation at the Missouri river points has not been made to millers who own elevators and are engaged in milling in transit there, and it is said that from this fact arises a discrimination in favor of millers at St. Louis who own elevators at Omaha or Kansas City and pass their grain through them. There is no discrimination here in favor of millers in St. Louis who have no ownership or operative control of an elevator at one of the Missouri river cities. There is no evidence that there is any miller in St. Louis who has such an ownership or control, and this suggested discrimination is too theoretical and improbable to persuade. If, however, it exists, the remedy is to grant reparation to the millers who elevate their grain in transit in accordance with the schedules of the carriers at the Missouri river points, as the commission has done in the cases of the operators of other elevators there (Nebraska Iowa Grain Company v. Union Pacific R. R. Co. [Jan. 6, 1909] 15 Interst. Com. R. 90), not to forbid all compensation for elevation in transit.

This brief review of the suggestions of counsel in support of the action of the commission discloses no rebate, no unjust discrimination, no undue prejudice—nothing that may bring the sweeping orders before us within the delegated powers of that body. On the other hand, the enforcement of these orders cannot fail to cause great losses and to entail much discrimination. It will strike down the practice of a decade in reliance upon which elevators have been built, terminal grounds in large cities have been bought and equipped, contracts have been made, business and markets have grown up, and business relations have been established. If the carriers whose roads terminate at the Missouri river cities may not pay for this elevation in transit, they must furnish it themselves free, or the producers and consumers whose grain passes over their roads must ultimately bear the expense of it. If they furnish it free, or if they construct elevators and charge a reasonable compensation for it, the owners of the terminal elevators at the river must lose the use which in large part induced their construction and must lose a portion of their value. If the carriers charge for it, producers and consumers of grain, which on account of its origin

must pass, or for other reasons does pass, over their railroads, must bear this charge, while those whose grain may pass over the through roads may be free from it, and this fact will necessarily have the effect to divert grain and the business in it from the Missouri river cities and to diminish the value of all investments therein in facilities for conducting it.

While these facts bear upon the wisdom and expediency of the orders, they are not unworthy of serious consideration in the determination of the question whether or not the power of the commission to affect so radically the property rights and interests of the parties to these suits really exists. The conclusion of the whole matter is that the sweeping orders under consideration were beyond the delegated power of the commission, and for that reason they must be annulled, and their enforcement must be enjoined. Peavey & Co. pray for a recovery from the Union Pacific Company of compensation for services rendered by it between December 17, 1906, and October, 1908, when the bill in its case was filed in the elevation of grain at Omaha and Kansas City at the agreed rate of 1¼ cents per 100 pounds. But on April 9, 1907, the commission reduced the rate of compensation for these services to three-fourths of a cent per 100 pounds. 12 Interst. Com. C. R. 85, 90. Reasonable compensation for such services includes not only the cost of the services but reasonable reward therefor in addition; but the evidence fails to convince that three-fourths of a cent per 100 pounds then was or now is less than a reasonable compensation for these services. Peavey & Co. may therefore recover of the Union Pacific Company for elevation services rendered prior to April 9, 1907, at the rate of 1¼ cents per 100 pounds and for such services rendered since that date at the rate of three-fourths of a cent per 100 pounds.

Let decrees be entered in accordance with the conclusions announced in this opinion.